IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

**IQUIAL MORGAN**  Case No. 1:19 CV 721
**ON BEHALF OF O.S.H.W.,**

    Plaintiff,

    v.  Magistrate Judge James R. Knepp II

**COMMISSIONER OF SOCIAL SECURITY,**

    Defendant.  MEMORANDUM OPINION AND ORDER

### INTRODUCTION

Plaintiff Iquial Morgan ("Morgan") filed a Complaint against the Commissioner of Social Security ("Commissioner") on behalf of O.S.H.W. ("Plaintiff"), seeking judicial review of the Commissioner's decision to deny supplemental security income ("SSI"). (Doc. 1). The district court has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). The parties consented to the undersigned's exercise of jurisdiction in accordance with 28 U.S.C. § 636(c) and Civil Rule 73. (Doc. 11). For the reasons stated below, the undersigned reverses the decision of the Commissioner and remands for proceedings consistent with this opinion.

### PROCEDURAL BACKGROUND

Morgan filed an SSI application on behalf of Plaintiff in February 2016, alleging a disability onset date of October 1, 2015. (Tr. 134-39). The claim was denied initially and upon reconsideration. (Tr. 98-100, 104-06). Morgan then requested a hearing before an administrative law judge ("ALJ"). (Tr. 107-09). On October 23, 2017, Morgan and Plaintiff (represented by an attorney) appeared and testified in at a hearing before the ALJ. (Tr. 46-71). On March 5, 2018, the ALJ found Plaintiff not disabled in a written decision. (Tr. 21-41). The Appeals Council denied

Morgan's request for review, making the hearing decision the final decision of the Commissioner. (Tr. 6-9); 20 C.F.R. §§ 416.1455, 416.1481. Morgan filed the instant action on behalf of Plaintiff on April 2, 2019. (Doc. 1).

## FACTUAL BACKGROUND[1]

Personal Background and Testimony

Born in 2009, Plaintiff was eight years old when he briefly testified at the October 2017 hearing. *See* Tr. 134; (Tr. 50-54).

Morgan also testified. (Tr. 56-69). She lived with Plaintiff and her two older children – ages nine and twelve. (Tr. 56). Plaintiff got along "horribl[y]" with his siblings, *id*.; they fought "a lot" over things like toys, television shows, or food (Tr. 57).

Plaintiff repeated the second grade; he was supposed to be in third. (Tr. 57). He operated at a kindergarten to first grade level. *Id*. Plaintiff was on an individualized education program ("IEP") which was "somewhat" helpful because he was able to spell a few more words and read better than before. (Tr. 57-58). The IEP was "falling short" because it required Plaintiff to transfer schools; Morgan had to keep pressing administrators "to even get the IEP started". (Tr. 58). Plaintiff had disciplinary problems at school due to fighting. *Id*.

Plaintiff previously took medication, but Morgan did not see any change in his behavior. (Tr. 59). He last took medication in early 2016. *Id*. Plaintiff did not have any negative side effects from the medications. (Tr. 67). He attended counseling at school. (Tr. 67-69).

Plaintiff did not typically "lash out" at Morgan, though he had good days and bad days. (Tr. 60). He also got along with Morgan's brother, *id*., and got along "great" with his cousins (Tr.

---

1. The undersigned summarizes the portions of the record relevant to the arguments raised by Morgan. *See Kennedy v. Comm'r of Soc. Sec.*, 87 F. App'x 464, 466 (6th Cir. 2003) (arguments not raised in opening brief considered waived).

61). Plaintiff had "a big problem with authority" (Tr. 65), often engaging in verbal altercations (Tr. 66).

In 2015 Plaintiff was involved in several incidents of vandalism. (Tr. 63-65). He threw batteries or rocks at passing cars on more than one occasion and broke windows at a nearby home. *Id*. Plaintiff stole from a nearby corner store "several times". (Tr. 66).

Medical and Educational Records

*Medical*

In July 2015, Plaintiff underwent a youth mental health assessment at Ohio Guidestone. (Tr. 433). Morgan reported Plaintiff had trouble concentrating and was easily distracted. *Id*. He angered easily and had sudden mood changes. *Id*. He was physically destructive with property, was involved in physical altercations, and stole items such as toys and food. *Id*. On examination, Plaintiff was well-groomed and had a preoccupied demeanor. (Tr. 436). His eye contact, activity, and speech were "average". *Id*. He had an anxious mood, full affect, cooperative but hyperactive behavior, and impaired attention/concentration. (Tr. 437). Providers assessed "moderate" symptom severity and "moderate" level of functioning impairment, *id*.; they diagnosed disruptive mood dysregulation disorder (Tr. 439). Plaintiff attended psychiatry sessions at Ohio Guidestone from August 2015 through February 2016 (Tr. 448-52, 454-58, 460-64, 466-71, 472-77). Providers monitored and adjusted Plaintiff's medications throughout this time. *See id*. Plaintiff's diagnoses in February 2016 were post-traumatic stress disorder, anxiety, obsessive compulsive disorder, and a mood disorder. (Tr. 473).

Plaintiff attended behavioral health counseling though Ohio Guidestone from August 2016 through May 2017 (Tr. 770-85).

3

Plaintiff treated with pediatrician Gwen Glazer, M.D., in October 2016. (Tr. 761). Morgan wanted to discuss, *inter alia*, Plaintiff's learning disability. (Tr. 762). Dr. Glazer noted that Morgan herself had bipolar disorder and a learning disability and she was a "poor historian". *Id*. Dr. Glazer noted Plaintiff had been diagnosed with a learning disability at age three. *Id.* Morgan reported concerns about Plaintiff's learning disability and behavioral problems (fighting and stealing). *Id.* Morgan reported that she discontinued Plaintiff's medications because she was concerned they caused headaches; she also expected his problems to "significantly improve" but they had not – she wanted an explanation as to why improvement had not occurred. *Id*. Dr. Glazer diagnosed a learning disability. (Tr. 762-63).

Plaintiff returned to Dr. Glazer in June 2017. (Tr. 808). Morgan reported Plaintiff's behavior with family members was "dangerous". *Id*. He threw rocks at people and broke neighbors' windows "[without] apparent cause". *Id*. Plaintiff saw a therapist at Ohio Guidestone but had not seen a psychiatrist during the past year. *Id*. Morgan discontinued psychiatric medications over concern about adverse side effects. *Id*. Morgan stated she would schedule an appointment with Plaintiff's psychiatrist to discuss medication. *Id.*

*Educational*

Plaintiff's second grade report card for the 2017 school year revealed he failed English and mathematics, received D's in social studies and science, B's in music and physical education, and an A in visual arts. (Tr. 206).

*April 2017 IEP Annual Review*

Plaintiff's April 2017 IEP covered several academic functioning tests and the results, as well as student work samples and classroom-based assessments. These items collectively painted

4

a picture of his "level of academic achievement and functional performance". (Tr. 273); *see* Tr. 266-82. The following paragraphs summarize many of the findings contained therein.

While he was in the second grade, Plaintiff's school psychologist administered the Wechsler Preschool Scale of Intelligence – Fourth Edition test in March 2016. (Tr. 266). Testing revealed a verbal comprehension score of 83 (low average) and a full-scale IQ score of 77 (borderline). *Id*.

The same day, Plaintiff's school psychologist administered the Woodcock Johnson IV test. *Id*. Plaintiff had a "very low" reading score of 55. (Tr. 267). "Performance was 'very low' at the level of a typical pre-kindergarten student. His comprehension [was] consistent with limitations in word reading skills." *Id*. Testing revealed his spelling ability was "very low" and his progress in this area was "'low average' at the level of a typical 1st grade student." *Id*. Plaintiff tested in the "low average" range in mathematics. *Id*.

Plaintiff also underwent the NWEA reading assessment throughout 2016 and 2017. His scores were:

>	Winter 2016		138
>	Spring 2016		163
>	Summer 2016		170
>	Fall 2016		158
>	Winter 2017		160
>	Spring 2017		164

*Id*. These scores were below the district recommended minimum score of 197 for Spring 2017. *Id*. Plaintiff scored a 68 on a February 2017 STAR reading assessment, which was considered "low". *Id*.

Student work samples and classroom-based assessments from February 10 through March 13, 2017 revealed Plaintiff read at eighteen words per minute on a kindergarten level with 72% accuracy. (Tr. 268). Further:

5

> [Plaintiff] read the first 100 Dolch sight words with 52% accuracy (52/100). The results of a phonics survey given on 3/13/17, shows [Plaintiff] is able to state the long and short vowel sounds with 100% accuracy, decode CVC pattern words with short vowels with 90% accuracy, r-controlled vowels with 0% accuracy and digraphs with 60% accuracy, consonant blend with short vowels (trap, silk, skill) with 40% accuracy, long vowel combinations (paid, tape, leap, boat) with 0% accuracy and multisyllabic words with 0% accuracy. When given a passage at the 1.0 level (Instructional), [Plaintiff] answered 1/5 comprehension questions correctly (20%). [Plaintiff] struggled to decode words and find specific evidence in the text to support his answer. When provided with a writing assignment. [Plaintiff] is able to write 1-2 sentences independently. His writing does not include complete sentences, end punctuation and proper capitalization. He frequently misspells below grade level words and does not use appropriate spacing between words.

*Id.*

In mathematics, Plaintiff had the following scores on an NWEA assessment:

| | |
|---|---|
| Fall 2015 | 121 |
| Winter 2016 | 150 |
| Spring 2016 | 175 |
| Fall 2016 | 162 |
| Winter 2017 | 165 |
| Spring 2017 | 171 |

*Id*. These scores also fell below the district recommended minimum of 196 in Spring 2017. *Id*.

Plaintiff's behavior was observed from February 10 through March 17, 2017. (Tr. 269). He made "significant behavioral improvements" since his last IEP. *Id*. Plaintiff stayed on task, completed his work, and "refrained from disrupting the learning environment in 4 out of 4 settings with 90% accuracy." *Id*. He exhibited self-control and made good choices when peers tried to distract him. *Id*. Plaintiff "refrained from making inappropriate comments in 3 out of 4 settings with 90% accuracy." *Id*. Progress notes also indicated that, at an observation made in March 2016, Plaintiff was "extremely hard working" one-on-one and, though he was often frustrated by tasks, he "persevered to the best of his ability". (Tr. 269-70).

Opinion Evidence

*Medical*

Dr. Glazer completed a medical and functional equivalence questionnaire in June 2017. (Tr. 786-89). Therein, she opined Plaintiff had a marked limitation in acquiring and using information because his "academic skills [were] significantly below grade level for age". (Tr. 786). She also found a marked limitation in the domain of attending and completing tasks due to Plaintiff being "easily distracted [and] unable to complete tasks"; she added that Plaintiff "required psychiatric medications to be able to function". (Tr. 787). Dr. Glazer next opined Plaintiff had an extreme limitation in his ability to interact with and relate to others. *Id*. This was due to his "poor relationship with family members [and] peers" and because he threw rocks at people and broke his neighbors' windows "without apparent reason". *Id*. She found a marked limitation in Plaintiff's ability to care for himself due to his need for psychiatric intervention (including medications) to function and perform activities of daily living. (Tr. 788). Dr. Glazer opined Plaintiff had a moderate limitation in the domain of health and physical well-being due to his shellfish allergy and "mild" hay fever. *Id*. She found a moderate limitation in Plaintiff's ability to move about and manipulate objects, without elaborating as she did with other domains. (Tr. 787). Dr. Glazer noted that she was "unsure" of any side effects Plaintiff felt from his medications, but explained that Plaintiff's mother removed him from his medication because she was concerned about possible side effects. (Tr. 788).

*Educational*

Ms. Amy Mehler completed school activities questionnaires in October and November 2016. (Tr. 199-200, 201-02). In October, she explained that she worked one-on-one with Plaintiff for 50 minutes daily in behavior, reading, and math. (Tr. 199). She noted that Plaintiff was in

7

second grade, but functionally operated at the kindergarten level. *Id*. He received special education services and a variety of academic accommodations. *Id*. Plaintiff's attention and concentration in class was "very low" requiring "constant redirection" and he was "easily distracted by his surroundings". *Id*. He had "trouble paying attention during instructions and need[ed] constant verbal reminders." *Id*. Regarding Plaintiff's ability to work independently of teacher supervision, she found he needed "constant prompting to stay on task" and "follow multi-step directions". *Id*. He needed "constant corrective feedback or [he] [became] lost and [did] not complete [work] correctly." *Id*. Similarly, he needed "constant guidance to complete instructional level work and turn [it] in on time." *Id*. Plaintiff's ability to respond to changes in his routine was "OK" but he sometimes became confused; his ability to respond to criticism was also "OK" but he sometimes rolled his eyes, though it was "very rare". *Id*. Regarding his ability to progress in learning the skills involved in reading, writing and mathematics, Ms. Mehler noted he "quickly f[ell] behind and forg[ot] new skills" and needed "intensive one-on-one instruction in reading, math and writing." *Id*. She had not observed any behavior concerns and felt Plaintiff was "good 90% of the time". (Tr. 200). He did not have problems exhibiting age-appropriate hygiene or any medical impairments which limited his ability to function at school; he had "normal" attendance. *Id*.

In her November assessment, Ms. Mehler offered many of the same opinions. (Tr. 201-02). She noted he easily forgot information, struggled with remaining focused, quickly fell behind, and required one-on-one help to correctly complete work. (Tr. 201). His ability to understand and complete assignments was "low" and he required constant prompting and redirection. *Id*. Directions often needed to be repeated two or three times. *Id*. Plaintiff's ability to progress in learning new skills involved in reading, writing and mathematics was also "low"; he "frequently

8

forg[ot] new information in seconds." *Id*. "He ha[d] trouble applying newly learned concepts/skills out of context." *Id*.

ALJ Decision

In a written decision, the ALJ noted Plaintiff was born in March 2009, making him a school-aged child both on the date of application and at the time of the decision. (Tr. 24). Plaintiff had not engaged in any substantial gainful activity since his application date. *Id*. The ALJ found Plaintiff had the severe impairments of ADHD, mood disorder, and learning disorder, but none of these impairments (alone or in combination) met or medically equaled the severity of one of the listed impairments. (Tr. 24-25).

The ALJ determined Plaintiff had less than marked limitation in the domains of: acquiring and using information, attending and completing tasks, ability to care for oneself, and health and physical well-being; no limitation in the domain of moving about and manipulating objects; and marked limitation in the domain of interacting and relating with others. *See* Tr. 34-41. Thus, the ALJ concluded, Plaintiff was not disabled from the date of his application through the date of the decision. (Tr. 41).

## STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact

9

if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

### STANDARD FOR DISABILITY

Eligibility for SSI is predicated on the existence of a disability. 42 U.S.C. § 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.905(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). For claimants under the age of 18, the Commissioner follows a three-step evaluation process—found at 20 C.F.R. § 416.924(a)—to determine if a claimant is disabled:

1. Is claimant engaged in a substantial gainful activity? If so, the claimant is not disabled regardless of their medical condition. If not, the analysis proceeds.

2. Does claimant have a medically determinable, severe impairment, or a combination of impairments that is severe? For an individual under the age of 18, an impairment is not severe if it causes a slight abnormality or a combination of slight abnormalities which causes no more than minimal functional limitations. If there is no such impairment, the claimant is not disabled. If there is, the analysis proceeds.

3. Does the severe impairment meet, medically equal, or functionally equal the criteria of one of the listed impairments? If so, the claimant is disabled. If not, the claimant is not disabled.

To determine whether an impairment or combination of impairments functionally equals a listed impairment, the minor claimant's functioning is assessed in six different functional domains. 20 C.F.R. § 416.926a(b)(1). If the impairment results in "marked" limitations in two domains of

functioning, or an "extreme" limitation in one domain of functioning, then the impairment is of listing-level severity and therefore functionally equal to the listings. *Id.* § 416.926a(a).

A "marked" limitation is one that is more than moderate but less than extreme, and interferes "seriously" with the ability to independently initiate, sustain, or complete activities. *Id.* § 416.926a(e)(2)(i). "It is the equivalent of functioning [one] would expect to find on standardized testing with scores that are at least two, but less than three, standard deviations below the mean. *Id*. An "extreme" limitation is one that interferes "very seriously" with the ability to independently initiate, sustain, or complete activities. *Id.* § 416.926a(e)(3)(i). The six functionality domains are: 1) acquiring and using information, 2) attending and completing tasks, 3) interacting and relating with others, 4) moving about and manipulating objects, 5) caring for yourself, and 6) health and physical well-being. *Id.* § 416.926a(b)(1). In determining functional equivalence, the ALJ must consider the "whole child." Social Security Ruling 09–lp, 2009 WL 396031, at *2.

## DISCUSSION

Morgan raises two objections to the ALJ's decision. First, she contends the ALJ violated the treating physician rule when considering Dr. Glazer's opinion. She next argues that the ALJ erred when he assigned "considerable" weight to Ms. Mehler's opinion, but did not incorporate any of her findings into the domains. For the following reasons, the undersigned reverses the Commissioner's decision on both grounds and remands for further proceedings.

<u>Treating Physician</u>

Morgan first argues the ALJ violated the treating physician rule in assigning "partial weight" to Dr. Glazer's opinion overall and "little weight" to her domain findings.

Generally, medical opinions of treating physicians are accorded greater deference than non-treating physicians.[2] *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 242 (6th Cir. 2007); *see also* SSR 96–2p, 1996 WL 374188. "Because treating physicians are 'the medical professionals most able to provide a detailed, longitudinal picture of [a claimant's] medical impairments and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone,' their opinions are generally accorded more weight than those of non-treating physicians." *Rogers*, 486 F.3d at 242 (quoting 20 C.F.R. § 416.927(d)(2)). A treating physician's opinion is only given "controlling weight", however, if it: (1) is supported by medically acceptable clinical and laboratory diagnostic techniques; and (2) is not inconsistent with other substantial evidence in the case record. *Id.* (citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004)).

Importantly, when a treating physician's opinion is not granted controlling weight, the ALJ must give "good reasons" for the weight given to the opinion. *Wilson*, 378 F.3d at 544 (quoting 20 C.F.R. § 404.1527(d)(2)). These reasons must be "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Id*. (quoting SSR 96-2p, 1996 WL 374188, at *5). When determining weight and articulating "good reasons", the ALJ "must apply certain factors" to the opinion. *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 660 (6th Cir. 2009) (citing 20 C.F.R. § 404.1527(d)(2)). These factors include the length of treatment relationship, the frequency of examination, the nature and extent of the treatment relationship, the supportability of the opinion,

---

2. Although recent revisions to the CFR have changed the rules regarding evaluation of treating physician opinions, such changes apply to claims filed after March 27, 2017, and do not apply to claims filed prior to that date. *See* Social Sec. Admin., *Revisions to Rules Regarding the Evaluation of Medical Evidence*, 82 Fed. Reg. 5852-53, 2017 WL 168819.

the consistency of the opinion with the record as a whole, and the specialization of the treating source. *Id.* While an ALJ is required to delineate good reasons, he is not required to enter into an in-depth or "exhaustive factor-by-factor analysis" to satisfy the requirement. *Francis v. Comm'r Soc. Sec. Admin.*, 414 F. App'x 802, 804-05 (6th Cir. 2011).

Here, the ALJ summarized Dr. Glazer's opinion (Tr. 33), assigning "partial weight" to the opinion overall and "little weight" to the domain findings. The ALJ found:

> Pursuant to 20 CFR 404.1527/416.927, if a treating source opinion is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record, we will accord the opinion controlling weight. In this case, upon consideration of the evidence, the undersigned finds Dr. Glazer's opinion is unsupported and inconsistent with the record as a whole. Specifically, the undersigned gave partial weight to the opinion to the extent that it was consistent with the above domain findings. Since the form had no limitations less than "moderate" the undersigned gave little weight to the findings in those domains.
>
> Further, this opinion is not consistent with the latest IEP which indicated that the claimant showed great improvement when he took his medication. The IEP indicated that he had made significant behavioral improvements during the year (Ex. 15E/7). He could stay on task, complete his work, and refrain from interrupting others. He had self-control 90% of the time and expressed himself with using words. His mother reported anxiety, depression, and aggression at home. Although he was often frustrated by tasks, he persevered to the best of his ability (Ex. 15E/8). His cooperation was admirable and he remained focused. He was no longer physically aggressive towards peers. Dr. Glazer also noted in her treatment records that his mother reported that he had not seen a psychiatrist in over a year and she decided to discontinue his medications for fear of side effects, and her understanding was complicated by her own bipolar disorder and learning disorder (Ex. 22F/6). Dr. Glazer told the claimant's mother to reschedule[] an appointment with the psychiatrist and put him back on his medications. Dr. Glazer's opinion does not appear to take into account the fact that the claimant's mother took him off his psychiatric medications one year prior.

(Tr. 33).

The undersigned finds this explanation not fully supported by substantial evidence for several reasons. First, the ALJ assigned "little weight" to Dr. Glazer's domain findings because "the form had no limitations less than 'moderate'". (Tr. 33). This is not accurate as the form gave

13

Dr. Glazer the option of finding "no evidence of limitation" in each of the six domains, certainly less than moderate. *See* Tr. 786-88. Next, the ALJ found the opinion inconsistent with Plaintiff's 2017 IEP:

> which indicated that the claimant showed great improvement when he took his medication. The IEP indicated that he had made significant behavioral improvements during the year (Ex. 15E/7). He could stay on task, complete his work, and refrain from interrupting others. He had self-control 90% of the time and expressed himself with using words. His mother reported anxiety, depression, and aggression at home. Although he was often frustrated by tasks, he persevered to the best of his ability (Ex. 15E/8). His cooperation was admirable and he remained focused. He was no longer physically aggressive towards peers.

(Tr. 33). This is a familiar piece – the ALJ copied it into his opinion six times, using it to support his evaluation of: credibility (Tr. 27), the State agency opinions (Tr. 31-32), Ms. Mehler's opinion (Tr. 32-33), Dr. Glazer's opinion (Tr. 33), and two functional domains (Tr. 36, 37). Unfortunately, his assessment here is segmented at best as it only relates to the *behavioral* portion of Plaintiff's 2017 IEP. *See* Tr. 269-70. The ALJ's observation leaves out that the majority of the IEP addresses significant academic, cognitive, and processing deficiencies such as Plaintiff's "very low" reading skills, functionally equivalent to a pre-kindergarten child; "low" writing abilities, "low average" mathematic abilities, NWEA results lower than the district minimums, "low average" verbal comprehension, and "borderline" IQ. (Tr. 266-68). (Tr. 786-87). Moreover, the IEP does not discuss Plaintiff's medications, much less whether his behavioral improvements occurred while he was on or off them. *See* Tr. 263-79. The behavioral aspects of the IEP cited by the ALJ may provide support to discount Dr. Glazer's opinion in at least one functional domain (attending and completing tasks), but the ALJ's consideration of the remaining portions of the IEP on remand may support, or undermine, his findings as to Dr. Glazer's other domain opinions.

14

> The ALJ next explained that:
>
> Dr. Glazer also noted in her treatment records that his mother reported that he had not seen a psychiatrist in over a year and she decided to discontinue his medications for fear of side effects, and her understanding was complicated by her own bipolar disorder and learning disorder (Ex. 22F/6). Dr. Glazer told the claimant's mother to reschedule[] an appointment with the psychiatrist and put him back on his medications. Dr. Glazer's opinion does not appear to take into account the fact that the claimant's mother took him off his psychiatric medications one year prior.

(Tr. 33). However, Dr. Glazer's opinion expressly *did* account for the fact that Morgan took Plaintiff off of his medications one year prior. *See* Tr. 788 ("parent. . . has discontinued medications because mom is concerned about possible side effects.").

The ALJ declined to assign controlling weight to Dr. Glazer's opinion because it was "unsupported and inconsistent with the record as a whole", ultimately granting partial weight to Dr. Glazer's opinion "overall", only "to the extent that it was consistent with the above domain findings." (Tr. 33). While supportability and consistency are proper reasons for an ALJ to assign less than controlling weight to a treating source, *Rogers*, 486 F.3d at 242, the ALJ's logic still needs to be traceable and supported such that the Court can link the evidence he cited to his conclusion, *Giles ex rel. Giles v. Astrue*, 483 F.3d 483, 487 (7th Cir. 2007). Here, as explained, the specific reasons given by the ALJ for assigning partial weight to the physician's opinion do not provide this necessary logical bridge. For these reasons, the undersigned must reverse as to Dr. Glazer's opinion.

Ms. Mehler

Morgan next argues the ALJ erred when he assigned "considerable weight" to the opinions of Plaintiff's teacher, Ms. Mehler, but did not incorporate her assessments into the functional domains, nor explain his failure to do so. The undersigned agrees and reverses.

The relevant Social Security Ruling provides that "[e]ducational personnel, such as school teachers, counselors, early intervention team members, developmental center workers, and daycare center workers" are "non-medical sources." SSR 06-03p, 2006 WL 2329939, at *2; *see also* 20 C.F.R. § 416.913. However, the Ruling also emphasizes that teachers are "valuable sources of evidence for assessing impairment severity and functioning[,]" who often "have close contact with the individuals and have personal knowledge and expertise to make judgments about their impairment(s), activities, and level of functioning over a period of time." SSR 06-03p, 2006 WL 2329939, at *3. In evaluating an educator's opinion, the Ruling provides that, "[a]lthough the factors in [ ] 20 CFR 416.927(d) explicitly apply only to the evaluation of medical opinions from 'acceptable medical sources', these same factors can be applied to opinion evidence from 'other sources.'" *Id.* at *4. "Not every factor for weighing opinion evidence will apply in every case," however:

> [f]or opinions from sources such as teachers, counselors, and social workers who are not medical sources, and other non-medical professionals, it would be appropriate to consider such factors as the nature and extent of the relationship between the source and the individual, the source's qualifications, the source's area of specialty or expertise, the degree to which the source presents relevant evidence to support his or her opinion, whether the opinion is consistent with other evidence, and any other factors that tend to support or refute the opinion.
>
> An opinion from a "non-medical source" who has seen the claimant in his or her professional capacity may, under certain circumstances, properly be determined to outweigh the opinion from a medical source, including a treating source. For example, this could occur if the "non-medical source" has seen the individual more often and has greater knowledge of the individual's functioning over time and if the "non-medical source's" opinion has better supporting evidence and is more consistent with the evidence as a whole.

*Id.* at *5-6.

Here, the ALJ summarized both of Ms. Mehler's 2016 opinions (Tr. 32) and concluded:

While teachers are not an acceptable medical source as the term is defined by the Regulations, the undersigned must evaluate their opinion to the extent that it is

16

> supported by the evidence of record taken as a whole (20 CFR 404.1513(a) and 416.913(a)). The undersigned gave considerable weight to these opinions because they were generally consistent with the record as a whole. Further, the record indicated when the claimant took his medication as prescribed, his behavior and learning issues improved. The IEP indicated that he had made significant behavioral improvements during the year (Ex. 15E/7). He could stay on task, complete his work, and refrain from interrupting others. He had self-control 90% of the time and expressed himself with using words. His mother reported anxiety, depression, and aggression at home. Although he was often frustrated by tasks, he persevered to the best of his ability (Ex. 15E/8). His cooperation was admirable and he remained focused. He was no longer physically aggressive towards peers. Dr. Glazer also noted in her treatment records that [his] mother reported that he had not seen a psychiatrist in over a year and she decided to discontinue his medications for fear of side effects, and her understanding was complicated by her own bipolar disorder and learning disorder (Ex. 22F/6). Dr. Glazer told the claimant's mother to reschedule[] an appointment with the psychiatrist and put him back on his medications. Dr. Glazer's opinion does not appear to take into account the fact that the claimant's mother took him off his psychiatric medications one year prior.

(Tr. 32-33).

In this assessment, the undersigned is unable to find, much less traverse, any logical bridge between the "considerable weight" assigned to Ms. Mehler's opinions and the ALJ's functional domain assessments. This is particularly so because it appears the ALJ largely copied and pasted the second half of this assessment from his assessment of Dr. Glazer's opinion. *Compare* Tr. 32-33 (ALJ's assessment of Ms. Mehler's opinions beginning with the sentence "The IEP indicated. . ."), *with* Tr. 33 (ALJ's assessment of Dr. Glazer's opinion beginning with the same). Thus, the ALJ's initial statement that he "gave considerable weight to [Ms. Mehler's] opinions because they were generally consistent with the record as a whole" is unsupported because the evidence he cited in support appears intended to discount a different opinion. And, as discussed above, much of this evidence is contradicted by the record.

Moreover, giving "considerable weight" to an opinion (from any source) suggests to a reviewing court that the ALJ relied on it when arriving at his conclusions. If the ALJ gave "considerable weight" to Ms. Mehler's opinions as he stated, he surely would have incorporated

17

at least some of her assessment into the six functional domains. There is no evidence he did so. The discrepancies are particularly obvious – and problematic – in the domains of attending and completing tasks and acquiring and using information where Ms. Mehler's opinion of Plaintiff's skills and abilities seems significantly more limited, yet the ALJ assigned a less than marked limitation. *See* Tr. 34-37. For example, Ms. Mehler rated Plaintiff's attention and concentration abilities as "very low"; he needed "constant redirection" and was "easily distracted". (Tr. 199). She noted Plaintiff "struggle[d] remaining focused during instruction and work time – quickly fall[ing] behind." (Tr. 201). Plaintiff also had "trouble paying attention during instructions and need[ed] constant verbal reminders" (Tr. 199); he "easily forg[ot] or [was] not focused" and needed directions repeated two to three times (Tr. 201). When asked about Plaintiff's ability to progress in learning new skills in reading, writing, and mathematics, Ms. Mehler opined it was "low" because he "frequently forg[ot] new information in seconds. He [had] trouble applying newly learned concepts/skills out of context." (Tr. 201); *see also* Tr. 199. The ALJ found Plaintiff had less than marked limitations each of these domains. (Tr. 34-37). The ALJ did not cite to Ms. Mehler's opinions (at 12E and 13E) in either assessment which is another indication her opinion is not incorporated into either domain. As with Dr. Glazer, the behavioral aspects of the IEP cited by the ALJ here may provide support to discount Ms. Mehler's opinion in at least one functional domain (attending and completing tasks), but the ALJ's consideration of the remaining portions of the IEP on remand may support, or undermine, his findings as to her other domain opinions.

The undersigned cannot say whether or not the ALJ's reconsideration of Dr. Glazer's or Ms. Mehler's opinions would change his findings in any of the six functional domains. Ultimately, the ALJ's error in each assessment was the logical gap in the weight assigned and his strong reliance on behavioral improvements in the IEP in an attempt to undercut their opinions in domains

that addressed non-behavioral issues. Thus, on remand, the ALJ should reevaluate each opinion and incorporate whichever findings he finds supported into each of the six functional domains, explaining himself fully.

## CONCLUSION

Following review of the arguments presented, the record, and the applicable law, the undersigned finds the Commissioner's decision to deny SSI unsupported by substantial evidence. Accordingly, the decision of the Commissioner is reversed pursuant to Sentence Four of 42 U.S.C. § 405(g) and remanded for proceedings consistent with this opinion.

**IT IS SO ORDERED.**

                                             s/ James R. Knepp II
                                             United States Magistrate Judge